IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| HENRY L. GULLEY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 11-00296-N |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Plaintiff, Henry L. Gulley, Jr. ("Gulley"), brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") from January 23, 2009. Pursuant to the consent of the parties (doc. 19), this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73. *See* Doc. 20. The matter came on for oral arguments on July 18, 2012, at which Colin Kemmerly appeared for the plaintiff and Assistant United States Attorney Patricia Beyer represented the Commissioner. Upon consideration of the administrative record (doc. 12), the parties' respective briefs (Docs. 12, 16), and arguments, the Court concludes that the decision of the Commissioner is due to be **REVERSED** and the case **REMANDED** to allow the Commissioner an opportunity to determine whether, in light of testing which revealed a performance IQ of 58 in 1992 and of 64 in 2003 together

with the diagnosis of "personality disorder, not otherwise specified (NOS), with

antisocial features" (Tr. 19, *citing* Exhibit C4F), Gulley meets the § 12.05(C) Listing and,

if so, whether there is sufficient evidence relating to Gulley's daily life to rebut the

presumption of disability associated with such § 12.05(C) Listing.

I.    Procedural History.

On March 20, 2009, Gulley filed applications under Titles II and XVI of the Social

Security Act (the Act), 42 U.S.C. §§ 401-33 and 1381-83c, respectively, for disability

insurance benefits and supplemental security income. (Tr. 143-52).  Gulley alleged that

he became disabled on January 23, 2009, due to back and hand pain (Tr. 215).  Gulley's

claim was denied on July 27, 2009 (Tr. 71-75).  Gulley's request for a hearing was timely

filed.  (Tr. 80).[1] A hearing before Administrative Law Judge ("ALJ")  was held on

November 17, 2010,  at which Gulley and Richard Wray Freeman, a vocational expert

(Tr. 119-120), testified (Tr. 37-50).   Gulley was born  on October 4, 1978, and was 32

years old at the time of his administrative hearing before the ALJ. (Tr. 41).

On November 23, 2010,  the ALJ entered an order denying Gulley's applications

(Tr. 14-36). The Appeals Council denied review of the ALJ's decision on April 28, 2011

(Tr. 1-3), making the November 23, 2010 decision  the final administrative decision. *See*

---

[1] Plaintiff's applications were processed pursuant to 20 C.F.R. §§ 404.906(b)(4), 416.1406(b)(4), whereby after the initial determination, the reconsideration step in the administrative review process was eliminated, and the claimant could immediately request an administrative hearing. All references to the Code of Federal Regulations (C.F.R.) are to the 2011 edition.

20 C.F.R. §§ 404.981, 416.1481.  Gulley now timely appeals from that decision and all administrative remedies have been exhausted.

II.    Issues on Appeal.

1.    Whether the ALJ erred by failing to find that Gulley is disabled under listing 12.05C?

2.    Whether the ALJ committed reversible error by failing to consider all the evidence of record in her decision, in violation of 20 C.F.R. §§ 404.953 and 416.1453?

3.    Whether the ALJ improperly dismissed Gulley's allegation that he was financially unable to obtain medication and medical treatment?

III.    Standard of Review.

A.    Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996);  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400;  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir.

1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence.");  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

     B. Statutory and Regulatory Framework.

  The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate

programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).  The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[2]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.*  It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the

---

[2] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical

Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"),or hear testimony

from a vocational expert (VE). Id. at 1239–40.

> C.      Listing 12.05(C).

Unlike the other mental disorders listings in the regulations, Listing 12.05

contains an introductory paragraph, or a "diagnostic description," with criteria the

claimant must meet in addition to meeting one of the "four severity prongs" for mental

retardation.  *See* Randall v. Astrue, 570 F.3d 651, 659-60 (5th Cir. 2009); Wall v. Astrue,

561 F.3d 1048, 1062 (10th Cir. 2009); Novy v. Astrue, 497 F.3d 708, 709 (7th Cir. 2007);

Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006); Foster v. Halter, 279 F.3d 348,

354 (6th Cir. 2001).  The Eleventh Circuit has recognized the distinction with respect to

Listing 12.05 as follows:

> Listing 12.05, the listing category for mental retardation, begins with an
> introductory paragraph, which states that "[m]ental retardation refers to
> significantly subaverage general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part
> 404, Subpart P, Appendix 1, § 12.05. The listing further provides that the
> "required level of severity for this disorder is met when the requirements in A, B,
> C, or D are satisfied." *Id.* Subsection C requires a claimant demonstrate "a valid
> verbal, performance, or full scale IQ of 60 through 70 and a physical or other
> mental impairment imposing an additional and significant work-related limitation
> of function." *Id.* at § 12.05(C). Section 12.00A states in pertinent part that
> "[l]isting 12.05 contains an introductory paragraph with the diagnostic description
> for mental retardation. It also contains four sets of criteria (paragraphs A through
> D). If your impairment satisfies the diagnostic description in the introductory
> paragraph and any one of the four sets of criteria, we will find that your
> impairment meets the listing." *Id.* at § 12.00A (emphasis added).

> We have determined that, to be considered for disability benefits under
> Listing 12.05, a claimant must at least (1) have significantly subaverage general

> intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age 22. <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997). In addition, for presumptive disability under 12.05C, the claimant must have (1) a valid IQ score of 60 through 70 inclusive, and (2) an additional mental or physical impairment significantly affecting the claimant's ability to work. *Id.* at 1219-1220.

<u>Pettus v. Astrue</u>, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007).  In <u>Humphries v.</u>

<u>Barnhart</u>,  the Eleventh Circuit had similarly analyzed the evidence and held:

> Here, substantial evidence supports the ALJ's finding that Humphries' impairments do not meet or equal the Listing 12.05(C) because, despite her IQ of 65, she does not have deficits in her adaptive functioning. Humphries worked in a school cafeteria for 21 years, and served as the manager for about 15 years. As manager, Humphries gave the five employees under her supervision daily lists of tasks, ensured breakfast and lunch were prepared on time, and ordered groceries for the cafeteria.

183 Fed. Appx. 887, 890 (11th Cir. Jun. 8, 2006).  A rebuttable presumption exists that

any claimant who has demonstrated a valid IQ score under 70 has also "manifested

deficits in adaptive functioning before the age of 22" and therefore satisfies the criteria

for Listing 12.05(C); the presumption must then be rebutted by the Commissioner with

evidence that, despite a valid IQ score of 60 through 70, the claimant does not have

deficits in adaptive functioning.  <u>Grant v. Astrue</u>, 255 Fed. Appx. 374, 375 (11th Cir. Nov.

13, 2007).  *See also* <u>Frank v. Astrue</u>, 2011 WL 6111692, *2-4  (S.D. Ala. Dec. 8,

2011)("[T]he law in this Circuit is clear that where, as here, a claimant has presented a

valid IQ score of 60 to 70, she is entitled to the presumption that she manifested deficits

in adaptive functioning before the age of 22 [and] [t]o establish a disability under section

12.05(C), a claimant must present evidence of a valid verbal, performance, or full-scale

I.Q. score of between 60 and 70 inclusive, and of a physical or other mental impairment imposing additional and significant work-related limitation of function.").

The second prong of Listing 12.05(C) requires evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Etheridge v. Astrue, 2009 WL 3233899, *10 (S.D. Ala. Sept. 29, 2009).  This means that the "work-related limitation of function" must be "significant," but it need not be a "severe impairment" as defined at Step 2:

> An impairment imposes significant limitations when its effect on a claimant's ability to perform "basic work activities" is more than slight or minimal. The question under Listing 12.05(C), however, is not whether the impairment is in and of itself disabling, *see* Wright v. Schweiker, 556 F.Supp. 468, 476 (M.D. Tenn. 1983); thus, "significant" requires something less than "severe" within the meaning of § 404.1520(c). That "significant" involves something more than "minima" " but less than "severe" follows from the regulations. Once a claimant is found to have a "severe impairment" within the meaning of § 404.1520(c), he is deemed disabled (he must also meet the durational requirement), and the analysis comes to an end. It is only when the impairment is not severe that the inquiry proceeds to determine whether the claimant is disabled under Appendix 1. A claimant is disabled under § 12.05(C) of the Appendix when the combination of the impairments renders the claimant severely impaired; that is, disabled. Thus, the impairment referred to in § 12.05(C) is something less than "severe" as defined in § 404.1520(c).

2009 WL 3233899 at *11, *quoting* Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985), and *citing* Cobb v. Barnhart, 296 F.Supp.2d 1295, 1297 (N.D. Ala. 2003)(court held that the second prong of Listing 12.05 "imposes a less stringent requirement than that imposed by 20 C.F.R. § 404.1520(c).")

Listing 12.05(C) requires a claimant to demonstrate "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an

additional and significant work-related limitation of function."   Pettus, 226 Fed. Appx. at

948.  In order to determine the severity of a mental impairment within the context of

12.05(C), the Commissioner is required, at all levels of the administrative process, to

apply the "special technique" of review set forth in 20 C.F.R. §§ 404.1520a and

416.920a.   Taylor v. Astrue, 2009 WL 5184402, *3 (M.D. Ala. Dec. 23, 2009), *citing*

Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007), and Binion v. Astrue, 2008 WL

4493238 (M.D. Ala. Oct. 3, 2008).  This "special technique" is described as follows:

> Under the "special technique," after determining whether or not the claimant
> suffers from some mental impairment(s), the Commissioner then rates the degree
> of functional limitation resulting from the impairment(s). The Commissioner rates
> the degree of limitation imposed in four distinct "functional areas" including:
> "activities of daily living; social functioning; concentration, persistence, or pace;
> and episodes of decompensation." § 404.1520a(c)(3). The Commissioner uses a
> five-point scale (none, mild, moderate, marked, and extreme) in rating the first
> three functional areas, and a four-point scale (none, one, two, three, and four or
> more) in rating episodes of decompensation. If the degree of limitation found in all
> of the first three areas is "none" or "mild," and there are no periods of
> decompensation, then the Commissioner will generally find the impairment not
> severe. 20 C.F.R. § 1520a(d)(1). If the ALJ's scoring of the claimant's limitations
> compels a finding that the claimant's mental impairment(s) is severe, the ALJ then
> proceeds to determine "if it meets or is equivalent in severity to a listed mental
> disorder." § 1520a(d)(2).
>
> The Commissioner is required to document his application of the special review
> technique at all stages in the administrative adjudication of a disability claim. 20
> C.F.R. § 1520a(e). During the initial stages of review, application of the "special
> technique" is facilitated by the completion of a Psychiatric Review Technique
> Form ("PRTF") by a qualified professional. During review by the ALJ, the ALJ is
> required "to complete a PRTF and append it to the decision, or incorporate its
> mode of analysis into [the ALJ's] findings and conclusions. Failure to do so
> requires remand." Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005).
> Importantly, the ALJ is required to document his or her application of the
> technique as to each of the given functional areas, and failure to do so precludes
> judicial review of the ALJ's decision. Id. Failure to properly apply the special
> review technique requires remand even if the ALJ's ultimate finding that the

claimant is not disabled is supported by substantial evidence. *Id. See also* <u>Binion</u>, 2008 WL 4493238 at *4.

<u>Taylor</u>, 2009 WL 5184402 at *3-4.  In other words, the mere existence of physical or mental impairments, even if supported  by sufficient medical evidence, does not reveal the extent to which they limit claimant's ability to work or undermine an ALJ's determination in that regard.  "[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." <u>Russell v. Astrue</u>, 331 Fed.Appx. 678, 681 (11th Cir. Jun. 15, 2009), *quoting*  <u>McCruter v. Bowen</u>, 791 F.2d 1544, 1547 (11th Cir. 1986).  Such is the purpose of the "special technique" described above, which "requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation" and must be incorporated in the ALJ's findings and conclusions.  <u>Moore</u>, 405 F.3d at 1213-14, *citing* 20 C.F.R. §§ 404.1520a-(c)(3-4) and (e)(2).

    IV.    <u>Relevant Facts</u>.

        1.    <u>Gulley's vocational background</u>.

Gulley was 32 years old on the date of the ALJ's decision (Tr. 31, 143).  Gulley went to school, in Educable Mentally Retarded (EMR) classes since the third grade (Tr. 282), until he was expelled in the 11th grade due to behavior problems (Tr. 220, 286).

Gulley has worked as a furniture assembler,[3] store laborer,[4] general laborer,[5] truck driver,[6] and small products assembler[7] (Tr. 46). According to Jill Hall, Ph.D., an examining Agency physician, Gulley's job history as of March 21, 2003, "includes working at Southern Aluminum for two and one-half months until he was laid off, at Standard Furniture for one month until he pulled a muscle and quit, at Burger King for three weeks but had no transportation and could not continue, and at Church's Chicken for two to three days but was fired for 'Moving too slow'." (Tr. 287).

    2.   <u>Medical Evidence</u>.

Although Gulley alleged in his applications for benefits that his disability was due to back and hand pain, he does not challenge the ALJ's findings that neither of these

---

[3] According to the vocational expert, Mr. Freeman, a furniture assembler is classified as semi-skilled, light work bearing Dictionary of Occupational ("DOT") Code 763.684-038 with an SVP of four. (Tr. 46). A listing which includes an SVP ("specific vocational preparation") designation of 4 is classified "semi-skilled" because it requires some skills but does not require doing the more complex work duties; may require alertness and close attention to watching machine processes or tending or guarding equipment. 20 C.F.R. 404.1568(b). A listing with an SVP of 2 is classified as "unskilled work" because it is a job that can be learned in one month or less. 20 C.F.R. 404.1568(a).

[4] A store laborer is classified as medium, unskilled work bearing DOT Code 922.687-058 with an SVP of two. (Tr. 46).

[5] A general laborer is classified as medium, unskilled work bearing DOT Code 559.667-014 with an SVP of two. (Tr. 46).

[6] A truck driver is classified as semi-skilled, light work bearing DOT Code 906.683-022 with an SVP of three. (Tr. 46).

[7] A small products assembler is classified as light, unskilled work bearing DOT Code 706.684-022 with an SVP of two. (Tr. 46).

alleged conditions is supported by any medically determinable impairment and the daily activities Gulley described when he testified. *See* Tr. 21-22. Gulley does, however, challenge the ALJ's decision to the extent it involves the evidence of record concerning his intelligence and diagnosis of personality disorder with antisocial features.

On April 28, 1987, when Gulley was still 8 years old, testing by Becky W. Palmer, a Psychometrist, revealed that he had a verbal IQ of 78, a performance IQ of 69, and a full scale IQ of 71. (Tr. 279). Gulley's "adaptive behavior" was not evaluated as evidenced by Ms. Palmer's recommendation that "a measure of adaptive behavior may be helpful in determining an appropriate educational program for this student." (Tr. 281).

On March 6, 1992, Gulley, then 13 years old, was evaluated and tested by S. Tandy Culpepper, a Rehabilitation Consultant. (Tr. 282-283). This testing revealed that Gulley had a verbal IQ of 72, a performance IQ of 58, and a full scale IQ of 63. (Tr. 283). Mr. Culpepper reported, *inter alia*, that:

> [Gulley's] mood was social and he talked freely with the examiner. His affect was appropriate. He did not have a memory impairment. He was never hyperactive and understood exactly what was expected. Following direction did not present problems to him. Both expressive and receptive language were delayed, yet communication was adequate. Henry can relate well to others.

(Tr. 283). Mr. Culpepper's stated conclusion was that "this child is appropriately placed in Special Education Classes." (Tr. 283).[8]

---

[8] Gulley argues that "[t]he Administrative Law Judge did not discuss the impact of Plaintiff being in EMR classes except to state, 'The claimant was in special education classes, but did fairly well in terms of grades.' (Exhibit C21E)." Doc. 13 at n. 1, *citing* Tr. 27. It would seem appropriate to find that Gulley's failure to receive any "credits for the last three years of (Continued)

On May 12, 1997, Gulley, who was then 18 years old and in the 11th grade "in special education classes," was evaluated and tested by a Clinical Psychologist, Blaine C. Crum, Ph.D.  (Tr. 284-285).  The testing revealed that Gulley had a verbal IQ of 76, a performance IQ of 70, and a full scale IQ of 73.  (Tr. 284).  Dr. Crum reported, *inter alia*, that:

> Henry's overall capabilities fall in the Low Borderline range of intellectual functioning, with a slight advantage on verbally related tasks.  He appears to have functioned in a previously dependent fashion, and has worked well under other supervision.  At this point, it may be beneficial to refer him to the Vocational Rehabilitation Services to determine if he could hold employment.  There was some indication that he had some potential, as reflected in the prior assessment by his teacher in April of 1997.

(Tr. 285).[9]  Dr. Crum also noted that "[v]ocationally, [Gulley] has done yard work for the school, and his last employment was during the prior summer (1996)."  (Tr. 284).

Gulley was evaluated and tested on March 21, 2003, when he was 24 years old, by Jill Hall, Ph.D, a Psychologist. (Tr. 286-293).   According to Dr. Hall, Gulley reported to her that he had been "kicked out" of high school in the 11th grade "due to behavior problems" and that he "can't work because he can't read well."  (Tr. 286).  Dr. Hall also reported Gulley's job history at the time as follows:

---

school" offsets at least in part any significance that an improvement of grades upon repeating the 9th grade might have (Tr. 263), particularly when Gulley was required to repeat a number of grades while in school.

[9] In the assessment referred to by Dr. Crum, Gulley's teacher also states that he "needed extra help with everything he did [and] [d]id not work independently" (Tr. 163);  and [he] was often the instigator of fights and arguments . . . Behavior is not typical" (Tr. 164).  In addition, Gulley's teacher confirmed that, "before quitting" school, there had been a "sudden worsening in the child's functioning or behavior; e.g., the child has become disruptive in class."  (Tr. 165).

> The patient's job history includes working at **Southern Aluminum for two and one-half months** until he was laid off, at **Standard Furniture for one month** until he pulled a muscle and quit, at **Burger King for three weeks** but had no transportation and could not continue, and at **Church's Chicken for two to three days** but was fired for, "Moving too slow." He reported that he last worked two weeks ago on a temporary basis helping to deliver furniture.

(Tr. 287)(emphasis added). Dr. Hall administered the WAIS-III intelligence test which revealed that Gulley had a verbal IQ of 72, a performance IQ of 64, and a full scale IQ of 66. (Tr. 289). According to Dr. Hall, the Full Scale score of 66 placed Gulley "in the Mild Mental Retardation range of intellectual functioning in comparison to the general population." (Tr. 290). However, Dr. Hall then admits that, based upon the Full Scale IQ score of 73 obtained in 1997 using the WAIS-R and of 71 obtained in 1987 using the WISC-R, "[i]t was estimated by this examiner before the evaluation was administered that the patient's IQ was in the Borderline range [and] his true intellectual level is most likely to be in the Borderline range." (Tr. 290). Contrary to the position argued by the Commissioner at oral arguments, Dr. Hall never invalidated any of Gulley's IQ results, including the performance IQ of 69 in 1987 (Tr. 279), 58 in 1992 (Tr. 283), 70 in 1997 (Tr. 284), or even the 64 obtained by Dr. Hall in 2003 (Tr. 288).[10] Dr. Hall's statement that Gulley "put forth little effort on this evaluation and these scores are not believed to be accurate" (Tr. 290) did not relate to the WAIS-III IQ test which Dr, Hall administered to Gulley but, instead, to the WRAT-3 test which Dr. Hall subsequently administered in

---

[10] "Listing 12.00 provides: 'In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05'." Black v. Astrue, 678 F.Supp.2d 1250, 1258-59 (N.D. Fla. 2010).

order "to measure the patient's achievement scores **in relation to his IQ scores.**"  (Tr. 290, emphasis added).[11]   Dr. Hall describes Gulley's condition as "Borderline Intellectual Functioning"  and "Personality Disorder, not Otherwise Specified with Antisocial Features" (Tr. 291).  Dr. Hall ultimately concludes:

> [Gulley] has the ability to understand, to carry out and remember simple instructions.  His ability to respond appropriately to supervision and coworkers would be dependent upon his willingness to comply with their requests.  [Gulley] does appear to have a history of mental slowness, but he has been employed in the unskilled work force on several occasions and should be able to continue with this work.  [Gulley] was last employed two weeks ago delivering furniture.

(Tr. 292).

On May 16, 2006, William Simpson, Ph.D., a State agency psychologist, reviewed the medical record and completed a psychiatric review technique form (PRTF).  (Tr. 308-320).  Dr. Simpson concluded that Gulley had only "mild" restrictions of activities of daily living,  "moderate" difficulties in maintaining social functioning,  "moderate" difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 318).  Dr. Simpson also concluded that "[e]vidence does not establish the presence of the 'C' criteria."  (Tr. 319).   Dr. Simpson also completed an assessment of Gulley's mental functional capacity (Tr. 322-25), indicating that, in the area of understanding and memory,  he was not significantly limited in his ability either to remember locations and work-like procedures or to understand and remember very

---

[11] Although she discounted the scores on the ground that Gulley "put forth little effort," Dr. Hall acknowledged that [o]n the WRAT-3 all of the patient's scores were in the Mild to Moderate Mental Retardation range."  (Tr. 290).

short and simple instructions but was "moderately" limited in his ability to understand and remember detailed instructions (Tr. 322).  In the area of sustained concentration and persistence,  Dr. Simpson found that Gulley was not significantly limited in his ability either to carry out short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; or to make simple work-related decisions but was "moderately" limited in his ability to carry out detailed instructions and his ability to maintain concentration for extended periods of time (Tr. 322).  Dr. Simpson found that Gulley was not significantly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 323). With respect to social interaction, Dr. Simpson found that Gulley had no significant limitations in his ability either to ask simple questions, to request assistance, to accept instructions, to respond appropriately to criticism from supervisors, to get along with coworkers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, or to adhere to basic standards of neatness and cleanliness but had moderate limitations in his ability to interact appropriately with the general public (Tr. 323).  In the area of adaptive behavior, Dr. Simpson assessed Gulley as having no significant limitations in his ability either to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places, to use public transportation, to set realistic goals, or make

plans independently of others (Tr. 323).  In sum, Dr. Simpson concluded that, according to all the evidence in the record as of May 16, 2006, Gulley "is able to understand & remember simple instructions,"  "can perform simple 1-2 step tasks," and "is capable of sustaining concentration for 2 hours w/normal breaks," and has no significant limitations in areas of  social interact and adaptation  (Tr. 324).

On July 15, 2009, Joanna Koulianos, Ph.D, another State agency psychologist, reviewed the medical record and completed another PRTF (Tr. 367-383).  Dr. Koulianos concurred with Dr. Simpson's assessment and concluded that Gulley had only "mild" restrictions of activities of daily living,  "moderate" difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 377).  However, unlike Dr. Simpson, Dr. Koulianos concluded that Gulley had a "marked" difficulties in maintaining social functioning, based on the following observation:

> As an adult he has been arrested 4 times for fighting and for violation of parole, clearly demonstrating a hx of difficulty getting along with and respecting the rights of others.  It is reasonable to postulate that his Axis II Dx poses significant limitations for social functioning.

(Tr. 379).[12]  Dr. Koulianos nonetheless concluded, as did Dr. Simpson, that "[e]vidence does not establish the presence of the 'C' criteria.  (Tr. 378).    Dr. Koulianos also

---

[12] A reference to Gulley's arrest record is contained in Dr. Hall's report dated March 26, 2003, in which she states:

> The patient reported that he has been arrested four times.  He was arrested in 1997 for fighting and for Violation of Probation.  He reported that he last served jail time in 1999 and that he is not currently on probation.

(Tr. 287).

completed an assessment of Gulley's mental functional capacity (Tr. 381-83), indicating that in the area of understanding and memory he was not significantly limited in his ability either to remember locations and work-like procedures or to understand and remember very short and simple instructions but was "moderately" limited only in his ability to understand and remember detailed instructions (Tr. 381). In the area of sustained concentration and persistence, Dr. Koulianos found that Gulley was not significantly limited in his ability either to carry out short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; or to make simple work-related decisions but was "moderately" limited only in his ability to carry out detailed instructions and his ability to maintain concentration for extended periods of time (Tr. 381). Dr. Koulianos found that Gulley was "moderately limited" in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 382). With respect to social interaction, Dr. Koulianos found that Gulley had no significant limitations in his ability either to ask simple questions or to maintain socially appropriate behavior, or to adhere to basic standards of neatness and cleanliness (Tr. 382). In contrast to Dr. Simpson, Dr. Koulianos did find that Gulley had moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors and marked limitations in his ability to interact with the general public and to get along with coworkers or peers without distracting them or

19

exhibiting behavioral extremes.  (Tr. 382).  Dr. Koulianos, in addition to her reference to Gulley's criminal history, commented that Gulley "sometimes has difficulty getting along with friends and family because they tell him to do things that he feels he is not able to do" and that he "does not handle changes in routine well and does not handle stress good."  (Tr. 379).  Dr. Koulianos assessed Gulley as having only moderate limitations in his ability to respond appropriately to changes in the work setting and to set realistic goals, or make plans independently of others (Tr. 382).  However, Dr. Koulianos explained in her "summary conclusions" that Gulley:

- could understand, remember, and carry out short, simple instructions;

- could attend for two-hour periods;

- had the ability to complete work duties if given extended time as needed;

- should have no interaction with the general public;

- was likely to take constructive criticism as demeaning and would respond by immediate withdrawal from the work place; therefore, any corrective action from employers should be offered in a very simple and supportive manner;

- was limited in his ability to get along with those he knows; and

- could not be expected to set long-term goals or plans.

(Tr. 383).  Dr. Koulianos also opined that any changes in Gulley's work setting would require practice before simple tasks could be adopted.  (Tr. 383).

       3.    <u>Plaintiff's testimony</u>.

Gulley testified at the hearing on November 17, 2010, that he got as far as the 11th grade in school and attended special education classes. (Tr. 41-42).  The last time he

worked was from April until November or December of 2008 at Standard Furniture on an

assembly line.  (Tr. 42).   Other jobs held in the past by Gulley included flagging traffic

for the State of Alabama, driving a delivery truck for Furniture Mart, doing work as a

helper for a construction company.  (Tr. 42-43).  Gulley testified that he still had pain in

his stomach from a stab wound suffered "a while back" but stated he has not consulted a

doctor because of the cost.  (Tr. 43-44).  Gulley stated that he lives with his mother who

does the cooking and cleaning, but that he tries to keep the yard clean: "I get out and pick

all the papers up, and rake . . . I rake the leaves and stuff."  (Tr. 44).  Otherwise, during a

typical day, he sits down and watches television. (Tr. 44). Gulley has one friend who is in

the military.  (Tr. 44).  Gulley has a four year old son, who is in the custody of his

"auntie" but with whom Gulley plays "every day" (Tr. 45).  Gulley testified that he

believes his hernia, which was repaired in 2008, is coming back because there is "lots of

pulling" but he has not consulted a doctor.  (Tr. 45).  Gulley has a driver's license[13] and

drives "[e]very now and then."  (Tr. 45).

### 4.   Vocational expert's testimony.

The vocational expert, Richard Wray Freeman, first testified regarding Gulley's

past work experience, specifically the exertion level and skill level.  Mr. Freeman

identified six titles applicable to Gulley's past work which ranged in exertion level from

light to medium and in skill level from unskilled to semi-skilled. (Tr. 46).

---

[13] Gulley reports that he drove a delivery vehicle for Furniture Mart. There is no
indication that Gulley's driver's license is a commercial driver's license (CDL) or that it was
obtained by a standard written examination.

Mr. Freeman was asked his opinion regarding a hypothetical individual who was Gulley's age, with the same education, and work experience but who also had the following limitations:  could only perform up to medium work[14]; simple, one to two-step tasks; no interaction with the general public; could work in close proximity to co-workers, but would need to work independently; corrective action at work would be offered in a simple supportive manner; could adapt to minimal changes in a work setting; should be allowed to practice new tasks before they are adopted; and would require assistance in establishing long-term goals and plans (Tr. 47).  Mr. Freeman testified that such an individual could perform Gulley's past work as a general laborer (identified as unskilled, medium work and listed as DOT # 559.667-014) and a small products assembler (identified as unskilled, light work and listed as DOT # 706.684-022).  (Tr. 47-48).

Mr. Freeman also testified, however, that there was "No work" for an individual of the same age, education, and past work experience as Gulley who had the following restrictions: "a marked limitation in the ability to interact appropriately with the general public . . . and a marked limitation on the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes."  (Tr. 48-49), *citing* Exhibit C17F (Dr. Koulianos's PRTF dated July 15, 2009, Tr. 381-384).

     5.    <u>ALJ's Decision</u>.

---

[14] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

The ALJ found that Gulley met the insured status requirements of the Act through December 31, 2013 (Tr. 19), and that he had not engaged in substantial gainful activity since January 23, 2009, the alleged onset date (Tr. 19). The ALJ found that Gulley had the following "severe" impairments: borderline intellectual functioning and personality disorder with antisocial features (Tr. 19), but that he did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (Tr. 22).

The ALJ found that Gulley had the following residual functional capacity (RFC) and capabilities:

- medium work exertionally;

- perform simple, routine, repetitive tasks,

- work in close proximity to others, but work independently;

- adapt to minimal changes in a work setting, and be allowed to practice new tasks before they are adopted;

- work in a job that would require no interaction with the general public;

- work with supervision that provides corrective action in a simple supportive manner;

- work in a job that provides assistance in establishing long-term goals and plans.

(Tr. 24).  The ALJ concluded that Gulley was capable of performing his past relevant work as a small products assembler and general laborer (Tr. 29). The ALJ consequently held that Gulley was not disabled within the meaning of the Act, from January 23, 2009, through the date of the decision (Tr. 30).

V.    <u>Analysis</u>.

    1.    <u>The ALJ erred by failing to find that Gulley's impairments satisfy Listing 12.05(C).</u>

Gulley first argues that  the ALJ erred by not finding that he was disabled under Listing 12.05(C).  (Doc. 13 at 3-6).  Gulley specifically contends that his impairments qualify under Listing 12.05(C) because he "was in Educable Mentally Retarded (EMR) classes, with multiple valid IQ scores of 70 or below since age 8; and has an additional mental impairment [ namely, a diagnosis of personality disorder with antisocial features] imposing significant limitation on [his] ability to work."  (Doc. 13 at 4).   At oral arguments, counsel also argued that any improvement achieved by Gulley upon repeating the 9th grade (Tr. 263) does not lessen the implications of Gulley's placement in Educable Mentally Retarded (EMR) classes since the 3rd grade and a history of repeating at least two grades, the 8th and the 9th.  (Tr. 263-264).

The Commissioner argues that Gulley's "mental condition did not satisfy the listing's diagnostic description of mental retardation."  (Doc. 16 at 8).  The Commissioner argues, in sum:

> While Gulley obtained an full scale IQ score of 66 in testing with Dr. Hall (Tr. 289), Dr. Hall did not diagnose Gulley with mental retardation (Tr. 289). Instead, Dr. Hall stated that Gulley's true intellectual level most likely was in the borderline range of intellectual functioning (Tr. 290), which reflects a lesser degree of intellectual dysfunction than mental retardation. Consequently, Gulley's contention that he satisfies Listing 12.05 would require a rejection of Dr. Hall's diagnosis of borderline intellectual functioning.  Based on Dr. Hall's opinion, however, the ALJ reasonably found that Gulley had severe borderline intellectual functioning, rather than mental retardation.

(Doc. 16 at 10, *citing* <u>Gibson v. Heckler</u>, 762 F.2d 1516, 1518 (11th Cir. 1985) (the ALJ may rely on the opinion of an examining physician).  The ALJ's failure to conclude that Gulley satisfy Listing 12.05(C) is not, however, supported by either Dr. Hall's diagnosis of "borderline intellectual functioning" in lieu of "mental retardation" or the requisite substantial evidence.

In conjunction with her determination at Step 2 that Gulley "has the following severe impairments: borderline intellectual functioning (BIF) and personality disorder with antisocial features," the ALJ mentions only that "[t]he claimant underwent a consultative examination with Jill Hall, Ph.D. on March 21, 2003, and was diagnosed with  borderline intellectual functioning (BIF) and personality disorder, not otherwise specified (NOS), with antisocial features." (Tr. 19, *citing* Exhibit C4F).  The ALJ does not discuss any of Gulley's IQ test results[15] or  Dr. Hall's assessment related to Gulley's intelligence or mental impairments. Instead, the ALJ merely catalogues the medical records and reports concerning Gulley's "hernia repair surgery" and "stab wound" and "hand and back pain."  (Tr. 19-22).

At step 3, the ALJ finds that Gulley "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" and discusses only whether Gulley satisfies the "paragraph B" criteria. (Tr. 22).[16]  The ALJ

---

[15] *See* IQ test results obtained in 1987 (Tr. 279), 1992 (Tr. 283), 1997 (Tr. 284), and 2003 (Tr. 288).

[16] The principal evidence cited by the ALJ in support of this finding is a Function Report, designated as Exhibit C12E (Tr. 223-230).  This Function Report purports to be completed by Gulley but is actually signed on 6/16/2009 by someone named "Cynthia Bradley" (Tr. 230).  The (Continued)

concludes here that, "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation . . . the 'paragraph B' criteria are not satisfied." (Tr. 23).  In regard to this conclusion, the ALJ does not discuss the Mental Residual Functional Capacity Assessment by Dr. Koulianos, namely that Gulley had "marked" difficulties in maintaining social functioning (Tr. 377) and that his ability to interact appropriately with the general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was "markedly limited" (Tr. 382).  Nor does the ALJ discuss Dr. Koulianos's summary conclusions, including her opinion that "any corrective action from employers should be offered in a very simple and supportive manner" and that "any changes in [work] setting will require practice before some simple tasks can be adopted."  (Tr. 383).

It is not until the ALJ is determining Gulley's "residual functional capacity" that she first specifically considers Gulley's IQ test results and some of the opinion evidence relating thereto.  (Tr. 24-29).[17]  For the most part, the ALJ simply sets forth (Tr. 25-26)

_____

ALJ does make one reference to Dr. Hall's report, namely her assessment that Gulley "was unable to do serial sevens, but could do serial threes with one mistake [and] could count backwards from twenty, spell 'tree' forward and backward, and solve basic mathematical calculations [but] could not make change."  (Tr. 23, citing Exhibit C4F (Tr. 286-293)).  This reference is made in the paragraph in which the ALJ discusses Gulley's "moderate difficulties" in the area of "concentration, persistence or pace."  (Tr. 23).

[17] Based upon this consideration, the ALJ concluded, in pertinent part, that Gulley "has the residual functional capacity to perform less than the full range of medium work  . . . with certain non-exertional restrictions associated with that level of exertion."  (Tr. 23-24 at Finding 5).  The ALJ further concluded that Gulley's  "specific mental capabilities during the period of (Continued)

Dr. Hall's report of her mental evaluation of Gulley on March 21, 2003(Tr. 286-293).

Although the ALJ appears to adopt Dr. Hall's opinion that Gulley's "true level of

functioning appears to be more likely in the Borderline range in comparison to the

general public"[18] (Tr. 292 reported at 26), neither Dr. Hall nor the ALJ determined that

Gulley's previous IQ test results were in any fashion invalid. Those previous results

included a performance IQ of 69 in 1987 (Tr. 279), 58 in 1992 (Tr. 283), 70 in 1997 (Tr.

284),  and 64 in 2003 (Tr. 288),[19] all within the 60 -70 range at issue in Listing 12.05(C).

At oral arguments, the Commissioner claimed that Dr. Hall had concluded that the IQ test

results she obtained were not valid because Gulley had not put forth effort during the

testing.  The record reveals, however, that Dr. Hall's statement that Gulley "put forth

little effort on this evaluation and these scores are not believed to be accurate" (Tr. 290)

did not relate to the WAIS-III (IQ) test Dr, Hall administered to Gulley but, instead, to

_____

adjudication have been the ability to perform simple, routine, repetitive tasks (SRRT's); work in close proximity with others, but work independently; adapt to minimal changes in work setting, and be allowed to practice new tasks before they are adopted when changes are made; work in a job that would require no interaction with general public; work with supervision that provides corrective action in a simple, supportive manner; and work in a job that provides assistance in establishing long term goals and plans."  (Id.).

[18] Dr. Hall acknowledged that Gulley's "Full Scale IQ score of 66 places this patient in the Mild Mental Retardation range of intellectual functioning in comparison to the general population," but then admits that "it was estimated by this examiner before the evaluation was administered that the patient's IQ was in the Borderline range."  (Tr. 290).  The ALJ noted that Dr. Hall had "estimated" the result "prior to testing" but nonetheless adopted the opinion.  (Tr. 26).

[19] "Listing 12.00 provides: 'In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05'."  Black v. Astrue, 678 F.Supp.2d 1250, 1258-59 (N.D. Fla. 2010).

the WRAT-3 test Dr. Hall subsequently administered in order "to measure the patient's achievement scores **in relation to his IQ scores.**"  (Tr. 290, emphasis added).[20]

The ALJ also noted Dr. Hall's opinion that Gulley "did not appear to have a mental illness; but appeared to have a personality disorder that exacerbates ***his ability to remain employed*** [and that Gulley] had been employed on several occasions for short periods of time."  (Tr. 26, emphasis added).   The ALJ did not acknowledge Dr. Hall's finding that Gulley's "longest period of employment was two and one-half months."  (Tr. 292), but did note Dr. Hall's conclusion that Gulley "may have some difficulties with the stresses of an ordinary work setting due to intellectual deficits and what appears to be a personality disorder." (Tr. 26).

The ALJ also reported Dr. Koulianos's opinion that Gulley had "marked limitation in the ability to interact appropriately with the general public" and, more importantly, a "marked limitation in the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes."  (Tr. 27).  These two limitations were specifically presented to the vocational expert during the hearing, who then concluded that "no work" existed in the economy for an individual with such limitations.  (Tr. 48-49), *citing* Exhibit C17F (Dr. Koulianos's PRTF dated July 15, 2009, Tr. 381-384).  The ALJ rejected this portion of the vocational expert's testimony, however, on the following grounds:

---

[20] Although she discounted the scores on the ground that Gulley "put forth little effort," Dr. Hall acknowledged that "[o]n the WRAT-3 all of the patient's scores were in the Mild to Moderate Mental Retardation range."  (Tr. 290).

> [T]he undersigned's hypothetical posed to the vocational expert specifically stated that the individual's work capabilities would be based on marked limitation in social functioning.  As stated above, the marked limitations in social interaction assigned by Dr, Koulianos are provided for in the residual functional capacity with the requirements of no contact with the general public, independent work and supportive correction.  The undersigned also notes that there is no evidence to support claimant's need to be isolated from co-workers.  He has never been fired or let go from a job because of problems getting along with other people.  (Exhibit C12E).[21]  The claimant has not required any inpatient treatment for inability to interact appropriately; and he is not currently receiving any mental health treatment or taking any medication..

(Tr. 30).  Neither the ALJ, nor the vocational expert, ever explained how the ALJ's proposal that Gulley work "in close proximity to others, but work independently" could eliminate the limitation identified by Dr. Koulianos concerning Gulley's "behavioral extremes" and propensity to be "distracting" to co-workers.  In addition, the ALJ's adoption of a rationale based on the fact that Gulley has not required "inpatient treatment for inability to interact appropriately, and [] is not currently receiving any mental health treatment or taking any medication,"  appears inconsistent with the ALJ's finding that Gulley "has the following *severe* impairments: borderline intellectual functioning (BIF) and personality disorder with antisocial features."  (Tr. 19, emphasis added).

In one line of cases, the Eleventh Circuit addressed the § 12.05(C) Listing in the following manner:

---

[21] Exhibit C12E is the "Function Report" purportedly completed by Gulley on (Tr. 223-230) but signed by a "Cynthia Bradley" (Tr. 230).  To the extent that the ALJ relies on the selection of the "no" box provided for the question "Have you ever been fired or laid off from a job because of problems getting along with people?", she appears to have ignored the explanation provided by Gulley: "because they don't let me work around a lot of people on the jobs I work."  (Tr. 229).

In <u>Hodges</u>, we held that there is a rebuttable presumption that a claimant manifested deficits in adaptive functioning before the age of 22 if the claimant established a valid IQ score between 60-70. <u>Hodges v. Barnhart</u>, 276 F.3d 1265, 1266, 1268-69 (11th Cir. 2001). We concluded that, absent evidence of a sudden trauma causing mental retardation, it was error for the ALJ not to recognize the presumption that the claimant manifested a mental impairment before the age of 22, and we remanded the case to allow the Commissioner to "present evidence of Hodge's daily life to rebut this presumption of mental impairment." *Id*. at 1268-69.

In this case, the ALJ found, and the Commissioner does not dispute, that Grant had a valid IQ score of 69 and that she possessed a physical or mental impairment imposing an additional and significant work-related limitation of function. She was therefore entitled to the benefit of the rebuttable presumption established in Hodges, and the ALJ was charged with determining whether there was sufficient evidence to rebut that presumption. The ALJ applied an improper legal standard, however, by requiring her to demonstrate deficits in more than one area of adaptive functioning before the age of 22. This was error because Grant was entitled to the benefit of the presumption.

<u>Grant v. Astrue</u>, 255 Fed. Appx. 374, 375 (11th Cir. Nov. 13, 2007).

As stated previously, the record in this case contains no evidence to invalidate Gulley's IQ scores of between 60-70 obtained on numerous occasions. (Tr. 25-26).  In addition, the ALJ found that Gulley had personality disorder with antisocial features which constituted a severe impairment. (Tr. 19).  The reports of Dr. Hall and Dr. Koulianos support a finding that Gulley's intellectual functioning and personality disorder with antisocial features impose "an additional and significant work-related limitation of function."  (Tr. 286-287; 378-382). It would thus appear that Gulley was entitled to the presumption of Listing 12.05(C).  *See* <u>Frank v. Astrue</u>, 2011 WL 6111692 (S.D. Ala. Dec. 8, 2011)(applied the presumption at issue in <u>Grant</u> and concluded that "a claimant meets the criteria for presumptive disability under section 12.05(C) when the

claimant presents a valid I.Q. score of 60 to 70 inclusive, and ***evidence of an additional mental or physical impairment that has more than "minimal effect" on the claimant's ability to perform basic work activities.***)(emphasis added), *citing* Edwards by Edwards v. Heckler, 755 F.2d 1513, 1517 (11th Cir. 1985).

In Etheridge v. Astrue, 2009 WL 3233899 (S.D. Ala. Sept. 29, 2009), this Court held as follows:

> Based upon a careful review of the ALJ's decision, the undersigned finds that the ALJ's finding that Plaintiff does not meet Listing 12.05C is not supported by substantial evidence because the decision is internally inconsistent. In one portion of the decision, the ALJ rejects Plaintiff's I.Q. scores as invalid, and accords great weight to Dr. McKeown's opinion that Plaintiff had intellectual functioning that was above mental retardation all of his life. (Tr. 24). However, later in the decision, the ALJ, in discussing Listing 12.05C, states that he is giving Plaintiff the benefit of the doubt, and finds that he meets the "first prong' of the listing by virtue of his I.Q. scores. Based on the Hodges' decision, at that point, Plaintiff was entitled to the presumption that mental retardation is a condition that remains constant throughout life; thus he was not required to present evidence that he manifested deficits in adaptive functions prior to age 22. Hodges, 276 F.3d at 1266. The ALJ was then required to either accept the presumption, or offer evidence to rebut the presumption. At that juncture, the ALJ did not point to any evidence to rebut the presumption, he instead went on to hold that Plaintiff did not meet Listing 12.05C because he did not have a mental or physical impairment imposing significant work related limitation. While the Commissioner argues that there is evidence in the record that demonstrates that Plaintiff had no deficits in adaptive functioning prior to age 22, the ALJ did not perform the required analysis upon giving Plaintiff the benefit of the doubt, accepting Plaintiff's I.Q. scores, and finding that he met the first prong of Listing 12.05C. Because of the inconsistencies in the ALJ's decision, the undersigned cannot determine what the ALJ ultimately concluded with respect to Plaintiff's intellectual functioning.

> This problem is compounded by the fact that the ALJ erroneously concluded that Plaintiff failed to present evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Listing 12.05C also requires evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." This means that the "work-related limitation of function" must be "significant," but it need not be a "severe impairment" as defined at Step 2:

An impairment imposes significant limitations when its effect on a claimant's ability to perform "basic work activities" is more than slight or minimal. The question under Listing 12.05(C), however, is not whether the impairment is in and of itself disabling, *see* Wright v. Schweiker, 556 F.Supp. 468, 476 (M.D. Tenn.1983); thus, "significant" requires something less than "severe" within the meaning of § 404.1520(c). That "significant" involves something more than "minima" " but less than "severe" follows from the regulations. Once a claimant is found to have a "severe impairment" within the meaning of § 404.1520(c), he is deemed disabled (he must also meet the durational requirement), and the analysis comes to an end. It is only when the impairment is not severe that the inquiry proceeds to determine whether the claimant is disabled under Appendix 1. A claimant is disabled under § 12.05(C) of the Appendix when the combination of the impairments renders the claimant severely impaired; that is, disabled. Thus, the impairment referred to in § 12.05(C) is something less than "severe" as defined in § 404.1520(c).

Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985); *See also* Cobb v. Barnhart, 296 F.Supp.2d 1295, 1297 (N.D. Ala. 2003), (court held that the second prong of Listing 12.05 "imposes a less stringent requirement than that imposed by 20 C.F.R. § 404.1520(c).")

   At Step 2, the ALJ found that Plaintiff has severe impairments of post traumatic stress syndrome, borderline intellectual function, bursitis of the left hip and back pain. (Tr. 29). Accordingly, in finding these severe impairments to exist, the ALJ necessarily found that Plaintiff has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Thus, the ALJ erred in finding that Plaintiff did not meet the second prong of Listing 12.05C. Accordingly, this case is due to be remanded as the ALJ's decision is not supported by substantial evidence.

2009 WL 3233899 at *10-11 (emphasis added).  As applied to this case, Gulley similarly

has been held to possess severe limitations of borderline intellectual function as well as

personality disorder with antisocial features.  Consequently the ALJ necessarily has

found that Gulley has "a physical or other mental impairment imposing an additional and

significant work-related limitation of function," a finding supported, *inter alia*,  by

Gulley's work history, arrests for fighting, and admitted inability to get along with people. This case must, therefore be remanded as the ALJ's decision is not supported by substantial evidence.

Finally, this case is also similar to Tyree v. Astrue, 2012 WL 345362 (S.D. Ala. Feb. 1, 2012), in which the Court discussed the inconsistency of an ALJ's finding at step 2 that the plaintiff's headaches constituted a "severe impairment" with the ALJ's finding at step 3 that the plaintiff "does have a valid verbal, performance, or full scale IQ of 60 through 70, [but] does not have a physical or other mental impairment imposing an additional and significant work-related limitation of function."   2012 WL 345362 at *2. Judge Milling, in Tyree, reasoned as follows:

> After reviewing the current regulation and the language in the Federal Register, the Court acknowledges that the second prong in Listing 12.05C requires evidence of an additional severe impairment. The Court also understands that, at the time of Edwards, the definition of severe impairment was not as stringent as required by the new regulation. See Black v. Astrue, 678 F.Supp.2d 1250, 1262 (M.D. Ala. 2010) ("Under an earlier version of this Listing, our circuit interpreted this as something that is 'significant' but less than a 'severe impairment' as defined in Step 2").

> However, this understanding does not negate the ALJ's finding at step two that Plaintiff's headaches are severe (Tr. 15). The Court does not understand how an impairment that is severe at step two becomes not severe for step three analysis when the definitions are the same for both. [Footnote omitted] Other courts have reached the same conclusion. Black, 678 F.Supp.2d at 1262; Carroll v. Astrue, 2009 WL 1708073, *1 (M.D. Ala. 2009 ("The standard for an "additional and significant" limitation is the same as for a "severe" impairment under 20 C.F.R. 404.1520(c) or 416.920(c)"). The Government has failed to bridge the gap to demonstrate that a finding in step two is no longer relevant in later steps of the analysis.

2012 WL 345362 at *2.   The ALJ in this case, like the ALJ in Tyree, inconsistently finds that Gulley's impairment of personality disorder with antisocial features is severe

for purposes of step two but less that "severe" or even "significant" for step three analysis.  The Commissioner has, therefore, failed in this case to demonstrate that its finding in step two is no longer relevant in later steps of the analysis and the case must be remanded for further consideration.

    2.    The ALJ erred in failing to consider all of the evidence.

As demonstrated above, the ALJ failed to properly consider all of the evidence of record in reaching her decision in violation of 20 C.F.R. §§ 404.953 and 416.1453. There is no indication that the ALJ  actually accepted the validity of Gulley's IQ test results in light of the absence of any evidence that they were invalid.  There is also no indication the ALJ properly evaluated Gulley's school records.  For example, although the ALJ acknowledged that Gulley attended "Educable Mentally Retarded (EMR) classes," she discounted the significance by contending that "he appeared to have done fairly well in most of his classes." (Tr. 26 and 27, *citing* Exhibit C21E (Tr. 263-267)). The ALJ does not explain what "fairly well" means and a review of Gulley's records makes this assessment by the ALJ questionable.

The ALJ also relied upon a statement made by one of Gulley's teachers on April 17, 1997, that Gulley "is very capable of holding and performing many jobs" (Tr. 27, *quoting* Exhibit C1E (Tr. 165)), but made no mention of the teacher's other observations that Gulley "needed extra help with everything he did" (Tr. 163) and "was often the instigator of fights and arguments" (Tr. 164).   Nor did the ALJ acknowledge or discuss Gulley's employment history other than the yard work he had done at the school when still a student (Tr. 27) and the work he did "at Standard Furniture for several months in

34

2008 on the assembly line" (Tr. 24). The ALJ made no assessment concerning the job

history reported by Dr. Hall on March 26, 2003 (Tr. 287) or Dr. Hall's observation that,

although Gulley "has been employed on several occasions, but only for short periods of

time [and] His longest period of employment was for two and one-half months." (Tr. 287

and 292).

      These evidentiary issues are meant to be illustrative rather than exhaustive. A

remand of this case will permit the ALJ to consider this evidence and all the evidence of

record. It is also clearly within the ALJ's authority to seek further evaluation or

clarification, if such is necessary to her assessment.

        3.   <u>Gulley's allegation concerning his inability to obtain treatment</u>.

      Gulley also objects to the ALJ's rejection of his contention that he was financially

unable to obtain medication and medical treatment because it was based upon the ALJ's

unsupported contention that "it is well established that community clinics exist in the

local area of [Gulley's] residence that offer both reduced cost and free medical treatment

for indigent people." (Doc. 13 at 3). In view of the Court's conclusion that this case

must be remanded, it is unnecessary for the Court to address this issue.

CONCLUSION

      For the reasons stated above, it is **ORDERED** that the decision of the

Commissioner of Social Security denying plaintiff's benefits be and is hereby

**REVERSED** and the case **REMANDED** to allow the Commissioner an opportunity to

determine whether, in light of testing which revealed a performance IQ of 58 in 1992

and of 64 in 2003 together with the diagnosis of "personality disorder, not otherwise

35

specified (NOS), with antisocial features" (Tr. 19, *citing* Exhibit C4F), Gulley meets the

§ 12.05(C) Listing and, if so, whether there is sufficient evidence relating to Gulley's

daily life to rebut the presumption of disability associated with such § 12.05(C) Listing.

**DONE** this __1st__ day of August, 2012.

> /s/ Katherine P. Nelson
> **KATHERINE P. NELSON**
> **UNITED STATES MAGISTRATE JUDGE**